1  Laurence F. Padway, #89314
   Law Offices of Laurence F. Padway
2  1516 Oak Street, Suite 109
   Alameda, California 94501
3  Telephone: (510)814-6100
   Facsimile : (510)814-0650
4
   David J. Linden, #41221
5  Attorney at Law
   Post Office Box 5780
6  Napa, California 94581
   Telephone: (707) 252-7007
7  Facsimile: (707) 252-7883

8  Attorneys for Plaintiff
        Neil Mark Sorger
9

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13

| NEIL MARK SORGER, | Case No.: 3:19-cv-00105-JSC |
|---|---|
| Plaintiff, | |
| vs. | |
| NOVARTIS CORPORATION DEATH BENEFIT & DISABILITY PLAN, and METROPOLITAN LIFE INSURANCE COMPANY | Date: January 16, 2019 Time: 9:00 a.m. |
| Defendants | |

22           **PLAINTIFF'S NOTICE OF MOTION AND**
23            **MOTION FOR SUMMARY JUDGMENT**

24

25

26

27

28

Plts. Mtn. For Summary Judgment

1

**TABLE OF CONTENTS**

2

Motion for Summary Judgment                                                    1

3

Memorandum of Points and Authorities                                           1

4

5

I.  The Parties Agree Mr. Sorger is Disabled.                                   1

6

II.  The Plan Documents.                                                       3

7

      1. The Pre-existing Condition Limitation of the Novartis Corporation Death

8

      Benefit and Disability Plan, as Described in its Summary Plan Description,

      is Unauthorized.                                                        3

9

      2. No Authority Authorizes an ERISA Plan to Allow Its Terms to be

10

      Determined by Someone Else.                                             4

11

      3.  The Supplemental Disability Benefit is Provided by the Sandoz Corporation

12

      Voluntary Employees' Beneficiary Association Master Trust, Which Does Not

      Authorize the Pre-existing Condition Limitation.                        7

13

14

III.    The Plan has the Burden of Proving that Any Pre-existing

15

       Condition Limitation Applies, and that It is "Clear, Plain and Conspicuous".   8

16

IV.    The Pre-existing Limitation in the Summary Plan Description Cannot Apply

      Because (1) the Supplemental Coverage had been in Force for More than

17

      Twelve Months and (2) the Plan Awarded the Benefits.                    9

18

V.     The Pre-Existing Condition Limitation Does Not Apply Because Mr. Sorger

19

      was Not Treated "for" Bipolar Disorder During the Lookback Period.      10

20

VI.    Conclusion.                                                          13

21

22

23

24

25

26

27

28

1

2

**TABLE OF AUTHORITIES**

**Cases**

3

4

*Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.,*
293 F. 3d 1139 (9th Cir., 2002)                                                 8

5

6

*Donovan v. Dillingham,*
688 F. 2d 1367 (11th Cir., 1982)                                                6

7

8

*Firestone Tire and Rubber Co. v. Bruch,*
489 U.S. 101 (1989)                                                             7

9

10

*Gilliam v. Nev. Power Co.*,
488 F.3d 1189 (9th Cir. 2007)                                                   5

11

*Grimo v. Blue Cross/Blue Shield of Vermont*,
34 F.3d 148 (2d Cir. 1994)                                                      6

12

13

*Intel Corp. v. Hartford*,
952 F. 2d 1551 (9th Cir., 1991)                                                 8

14

15

*Kunin v. Benefit Trust Life Ins. Co.*,
910 F.2d 534 (9th Cir., 1990)                                                   8

16

17

*McLeod v. Hartford Life & Accident Co.,*
372 F. 3d 618 (3rd Cir., 2004)                                               10-11

18

19

*Sabbatino v. Liberty Life Assurance Co.,*
286 F. Supp. 2d 1222 (N. D. Cal., 2003)                                         8

20

*Saltarelli v. Bob Baker Group Medical Trust,*
35 F.3d 382 (9th Cir., 1994)                                                    8

21

22

*Scott v. Gulf Oil Corp.,*
749 F. 2d 1499 (9th Cir., 1985)                                                 5

23

24

*Smith v. Cmta-Iam Pension Trust,*
746 F.2d 587 (9th Cir., 1984)                                                  13

25

26

**Statutes**

27

29 C.F.R. § 2520.102-2(b)                                                       9

28

29 U.S.C. § 1022(a)                                                             9

**Motion for Summary Judgment**

Please take notice that on the date and time and at the place set forth on the first page of this document, plaintiff Neil Sorger will move for an order of summary judgment that defendants wrongfully terminated payment of his supplemental disability benefit (as described in section 5.3(b of the Novartis Corporation Death Benefit and Disability Plan) by adverse determination made on November 8, 2017.

Mr. Sorger further requests the Court, following its determination that the supplemental disability benefits were wrongfully terminated to (1) reinstate the benefit (2)order the parties to meet and confer on the amount of back benefits and interest due, and if they are unable to stipulate to those amounts, to file a joint letter brief so that the Court may make that determination.

Finally, Mr. Sorger moves for costs of suit, including attorneys' fees, the amount to be determined by filing a cost bill and a fee motion under F. R. C. P., Rule 54.

November 18, 2019                    /s/Laurence F. Padway
                                     Laurence F. Padway
                                     Attorney for plaintiff Neil Sorger

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.
## The Parties Agree Mr. Sorger is Disabled.

Neil Sorger was employed by Novartis Corporation as a sales representative. All parties agree that Mr. Sorger has been disabled and unable to work since April 9, 2013. AR 2651. Mr. Sorger, receives the basic disability benefit of 50% of predisability earnings.  The sole issue is whether or not the defendants' appropriately retroactively determined that Mr. Sorger is not  entitled to the "supplemental" disability benefit, which increases the monthly payment to 67% of pre-disability earnings. This issue turns on whether (1)the plan has a properly authorized pre-existing condition limitation, (2) whether that limitation applies, and (3) whether defendants may first apply it a year after having approved the supplemental benefit payment.

Initially Mr. Sorger became disabled by a low back condition described by his surgeon as "neurogenic claudication secondary to severe multilevel lumbar stenosis with spinal deformity," treated, among other things, by a three level spinal fusion with instrumentation from L4-S1 and separate[1] total laminectomies of L4 and L5, and bilateral hemilaminectomies at S1 in a massive surgical procedure on  July 9, 2013.  AR 1764-1786.[2]  On April 4, 2014, long term disability benefits were approved commencing February 14, 2014, but limited to 24 months because of a plan limitation typically intended for disability from soft tissue injuries which cannot be objectively verified. AR 2652.  A Functional Capacity Evaluation performed on January 8, 2015, at

---

[1] Although these were performed during the same surgery, the surgeon identifies these as "separate" because they are not included in the usual three level fusion.

[2] Neurogenic claudication results from compression of the spinal nerves in the low back from stenosis (or narrowing) of the spinal canal.  If the nerve is compressed by stenosis (or narrowing) of the foramen (the opening between the vertebrae where the nerve exits the spinal canal on its journey to the arm, leg, or elsewhere),  the result is called a  radiculopathy.

the request of defendants, AR 1797, found that  Mr. Sorger had a less than sedentary work capacity.

Asked "[c]an this individual safely return to work in *any* occupation," the examiner answered

"[n]o." AR 1798.

Nonetheless, defendants terminated benefits on February 18, 2016, claiming they

were subject to the plan's 24 month limitation.  AR 1916, 1918.  Mr. Sorger applied for additional

benefits based upon his psychiatric disability for a bipolar condition, which was first diagnosed on

July 24, 2014. AR 299..  Defendants denied benefits for the bipolar condition on January 15, 2016,

because "there is inadequate information to support psychiatric impairment..." AR 1917.  On

September, 6 2016, defendants overturned this denial on administrative appeal, and benefits were

then paid for both basic disability (50% of earnings)  and supplemental disability (an additional 17%

of earnings). AR 604.  More than a year later, defendants changed this decision, retroactively

denying supplemental disability benefits now claiming  that the bipolar condition was a "pre-

existing condition."  AR 504.  The basic disability benefit, for which there is no limitation on pre-

existing conditions, continues to be paid.

We demonstrate below that: (1) the pre-existing condition limitation for the

supplemental disability benefit was never properly authorized; (2) by its terms, it ceased to apply

"12 months after the effective date of your supplemental LTD coverage," AR 12, i.e., it ceased to

apply as of January 1, 2014;  (3) there is no provision which authorizes the plan to grant

supplemental benefits and later retroactively change its decision;  and (4) the Bipolar condition was

neither diagnosed nor treated  until July 24, 2014, well after the end of the "lookback" period which

was October to December, 2012.  While the nurse practitioner treated Mr. Sorger for depression and

other conditions during the lookback period, she did not  diagnose Bipolar disorder until 2014.  AR

299.  During the "lookback" period, it was considered a "rule out" or "working" diagnosis.  AR 299.


**II**
**The Plan Documents.**

**1. The Pre-existing Condition Limitation of the Novartis
Corporation Death Benefit and Disability Plan, as Described in its
Summary Plan Description,  is Unauthorized.**

The primary plan providing disability benefits is the Novartis Corporation Death

Benefit and Disability Plan (hereafter Plan 1).  AR 4743.  Plan 1 describes the "basic" and

"supplemental" long term disability benefits in section 5.3 (AR 4754):

> 5.3 Levels of Disability Benefits.
>
> (a) The basic long-term disability Benefit under this Article 5 is 50%
> of a Participant's Total Pay, with a minimum monthly benefit of $100.
>
> (b) A Participant may elect to purchase supplemental long-term
> disability coverage so that the total long-term disability Benefit under
> this Article 5 equals 67% of the Participant's Total Pay. Supplemental
> coverage can be purchased only during the annual enrollment period
> while the Participant is actively at work and not receiving short-term
> disability Benefits under Article 4. **Such supplemental long-term
> disability coverage shall be subject to pre-existing condition
> limitations as established from time to time by the Claims
> Administrator...** [Emphasis added]

The "Claims Administrator" is Metropolitan Life Insurance Company.  AR 4757.

Plan 1 grants  sole authority to Metlife to  promulgate rules about pre-existing conditions.

Metropolitan Life **does not insure** Plan 1, but instead it "agrees to perform any and all services (the

"Services") set forth in any task order attached to this Agreement..." AR 28.  The task orders appear

at AR 51-78.  Nowhere is Metlife tasked with preparing "pre-existing condition limitations," or

provided with any guidance as to what they should contain. Metlife does "provide advice" concerning plan design and plan documents, AR 54, but it does not agree to provide any pre-existing condition limitations, nor does the record contain any evidence that Metlife ever did provide those. The only place where any limitations on pre-existing conditions appear is in the Summary Plan Description, AR 12, and the agreement between Plan 1 and Metlife provides that Novartis -  not Metlife, produces the SPD.  AR 65, 74.

To summarize:

1.  The only place the pre-existing condition limitation for the Supplemental disability benefit appears is in the Summary Plan Description, which was prepared by Novartis.

2.  Metlife has sole authority to determine the pre-existing condition rules.

3.  Metlife was never asked to, and did not, author any rules for pre-existing conditions.[3]

**2. No Authority Authorizes an ERISA Plan to Allow Its Terms to be Determined by Someone Else.**

ERISA applies to plans "established" by employers or employee organizations.  29 U.S.C.1003. Plan 1 purports to delegate to Metlife the sole ability to formulate and change plan terms regarding pre-existing condition limitations for the supplemental disability benefit. This is far different than the grant of discretion to interpret plan terms sometimes used in ERISA plans. . It is an interesting question whether a plan sponsor can delegate the right to determine plan terms, without limitation, and without any guidance, to a third party, and authorize that third party,  at whim, to change those terms.

---

[3]The failure of the record to show that Metlife actually prepared the pre-existing condition rules was called to the attention of defense counsel by email of September 18.  Padway Declaration, exhibit 1.

May a plan sponsor delegate the determination of the terms of the plan to a third party  without provision for guidance or review of the actions of that third party?  Or does that make the plan, to that extent, illusory?  An ERISA plan is a contract interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience." Gilliam v. Nev. Power Co., 488 F.3d 1189, 1194 (9th Cir. 2007) (internal quotation marks and citation omitted).  The terms need to be certain.   While this precise issue appears to be one of first impression, it does not serve ERISA's remedial purpose to empower a third party to arbitrarily determine and alter the terms of the plan.

The Ninth Circuit in *Scott v. Gulf Oil Corp.,* 749 F. 2d 1499, 1503 (9th Cir., 1985) reviewed a promise to pay severance benefits at the rate of two weeks salary for every year of employment to determine whether or not it constituted an ERISA plan:

> "ERISA does not contain a clear definition of the word 'plan.' The definition of 'employee welfare benefit plan' itself uses the word 'plan': a 'plan, fund, or program . . . established or maintained . . . for the purpose of providing' the specified benefits. See 29 U.S.C. § 1002(1). Although ERISA contains numerous requirements that a plan must adhere to -- a written instrument, named fiduciaries, public reports, etc., see id. §§ 1021-1031, 1101-1114 -- these requirements are not part of the definition of 'plan.'"

In *Scott,* the Ninth Circuit held that a mere allegation that an employer decided to provide a benefit plan was not enough to invoke ERISA's coverage, and something more was needed, but the Ninth Circuit declined to define the minimum requirements.

A plan under ERISA is established " if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of

financing, and procedures for receiving benefits.'" *Grimo v. Blue Cross/Blue Shield of Vermont*, 34 F.3d 148, 151 (2d Cir., 1994).

In *Donovan v. Dillingham*, 688 F. 2d 1367, 1373 (11th Cir., 1982), the Eleventh Circuit rejected the proposition that the term "'establish' means no more than an ultimate decision by an employer . . . to provide the type of benefits described in ERISA." Donovan, 688 F.2d at 1372-73. The court held that "[a] decision to extend benefits is not the establishment of a plan or program." Id. at 1373. Instead, "[a]cts or events that record, exemplify or implement the decision" can be introduced as "direct or circumstantial evidence that the decision has become reality." Id. The court emphasized that "it is the reality of a plan, fund or program and not the decision to extend certain benefits that is determinative."

We are not suggesting that there is insufficient information to find the existence of an ERISA plan– in general.  But as to the pre-existing condition limitation, there really is nothing more than a desire expressed that there might be one, and a plan must do something more than merely ask a third party to create those plan terms –especially when the "task orders" for Metropolitan Life do not even mention its obligation to provide the pre-existing condition limitations.

Simply put, the plan sponsor may not delegate to someone else the right to determine, and alter, the terms of the plan, especially without reserving the final right to approve of those terms. To the extent, therefore, that the plan purported to make Metlife responsible for the terms of its pre-existing condition language, that is an improper delegation, and the pre-existing condition language, had Metlife provided any would not be a valid part of Plan 1.

1

2      **3.  The Supplemental Disability Benefit is Provided by the Sandoz
             Corporation Voluntary Employees' Beneficiary Association
3            Master Trust, Which Does Not Authorize the Pre-existing
             Condition Limitation.**

4              The supplemental disability benefit is paid for by the employees who elect to

5      participate in it.  Those employees pay the premiums to the Sandoz Corporation Voluntary

6      Employees' Beneficiary Association Master Trust (hereafter referred to as "Plan 2.").[4] AR 4777.

7
       The trust document appears at AR 4811, and an amendment which, among other things, changes the
8
       references from "Sandoz Corporation" to "Novartis Corporation," appears at AR 4770.[5]
9

10

11             Nothing in Plan 2 either provides for the exercise of discretion by the ERISA

12     fiduciary, nor reserves the right to delegate discretion. In ERISA cases, the issue of whether the plan

13     has delegated discretion to a claims administrator is  one of the principal issues, because it may

14     determine  whether the Court review's plan's decision  *de novo* or for abuse of discretion.  The

15     Supreme Court held in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989) that " a

16     denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard

17     unless the benefit plan gives the administrator or fiduciary discretionary authority to determine

18     eligibility for benefits or to construe the terms of the plan. Because this benefit is being provided

19     through Plan 2, the decision of the plan should be reviewed *de novo*.

20

21

22

23

24

25

26     ————————————————

27             [4]Sandoz is a predecessor to Novartis.

28             [5] Defense counsel confirmed by email of September 9, 2019, that the supplemental disability
       benefit is funded through Plan 2.  Padway Declaration, exhibit 2.

**III.**
**The Plan has the Burden of Proving that Any Pre-existing**
**Condition Limitation Applies, and that It is**
**"Clear, Plain and Conspicuous".**

The doctrine that courts will protect the reasonable expectations of plan participants has been imported from the insurance context into ERISA plans.  *Saltarelli v. Bob Baker Group Medical Trust,* 35 F.3d 382, 387 (9ᵗʰ Cir., 1994).   This includes the rule that exclusions and limitations of coverage must be "clear, plain and conspicuous." *Id.*

And while the plan participant bears the burden of proving entitlement to coverage, the burden of proof on limitations and exclusions from coverage lies with the plan. *Intel Corp. V. Hartford*, 952 F. 2d 1551, 1557 (9ᵗʰ Cir., 1991), *Sabbatino v. Liberty Life Assurance Co.,* 286 F. Supp. 2d 1222, 1232 (N. D. Cal., 2003).

Ambiguities created by the plan drafters are construed against the plan, as the rule of *contra preferentem* applies in all 50 states.   *Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 539-40 (9th Cir., 1990).  If plan documents conflict, courts bind ERISA defendants to the more employee-favorable documents:

> Any burden of uncertainty created by careless or inaccurate drafting ... must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document. Accuracy is not a lot to ask.
>
> *Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc.,*
> 293 F. 3d 1139 (9ᵗʰ Cir., 2002)

1    Similarly, the Summary Plan Description must be "written in a manner calculated to

2  be understood by the average plan participant, and shall be sufficiently accurate and comprehensive

3  to reasonably apprise such participants and beneficiaries of their rights and obligations under the

4  plan." 29 U.S.C. § 1022(a). Regulations also state that:

5

6

7          The format of the summary plan description must not have the effect
          [of] misleading, misinforming or failing to inform participants and
8          beneficiaries. Any description of exception, limitations, reductions,
          and other restrictions of plan benefits shall not be minimized, rendered
9          obscure or otherwise made to appear unimportant. Such exceptions,
          limitations, reductions, or restrictions of plan benefits shall be
10         described or summarized in a manner not less prominent than the
          style, captions, printing type, and prominence used to describe or
11         summarize plan benefits. The advantages and disadvantages of the
          plan shall be presented without either exaggerating the benefits or
12         minimizing the limitations.

13         29 C.F.R. § 2520.102-2(b).

14

15

16                                          **IV.**
                   **The Pre-existing Limitation in the Summary Plan Description**
17                 **Cannot Apply Because (1)the Supplemental Coverage had**
                        **Been in Force for  More than Twelve Months and**
18                         **(2) the Plan Awarded the Benefits.**

19    The only place the "pre-existing condition rule for supplemental LTD coverage"

20

21  appears is in the Summary Plan Description.  The first paragraph of that rule reads:

22

23         If  you have a pre-existing condition and elect supplemental LTD
          coverage, the supplemental LTD coverage for that pre-existing
24         condition will not take effect for 12 months after the effective date of
          your supplemental LTD coverage.

25

26  The supplemental LTD coverage went into effect on January 1, 2013. AR 504  Accordingly, the rule

27  does not apply to any disability after January 1, 2014.  The record contains a memorandum which

28  discusses the reasons why the denial of benefits for Bipolar condition was overturned.  AR 4016. On

page AR 4017, the memorandum states that "Pre-Ex investigation ruled out," so whoever worked on

the appeal presumably realized the limitation dropped off after the supplemental coverage had been

effect for 12 months.  The decision to overturn the denial of benefits for the Bipolar disorder was

based upon a review done by Dr, Mark Schroeder for the plan.  AR 4004.  Dr. Schroeder was not

asked to determine whether or not the bipolar condition was a pre-existing condition.  The plan's

letter to Mr. Sorger's counsel announcing the reversal of its decision on appeal, on September 6,

2016, does not describe the reasons for that reversal.  AR 605.

There is no provision of the plan which permits it to simply change its mind about an

award of benefits.  There is nothing in the record which shows that any consideration was given to

whether or not the doctrine of unilateral mistake would allow the plan to revisit its decision.

**V.**
**The Pre-Existing Limitation Does Not Apply**
**Because Mr. Sorger was Not Treated "for"**
**Bipolar Disorder During the Lookback Period.**

The Summary Plan Description defines a pre-existing condition as:

> A **pre-existing condition** is an injury, sickness, or pregnancy for
> which you, in the three months before your supplemental LTD
> coverage took effect:
> .   received medical treatment, consultation, care, or services,
> .   took prescription medications or had medications prescribed, or
> .   had symptoms or conditions which would cause a reasonably
> prudent person to seek diagnosis, care, or treatment.

The critical language is "for " received treatment, etc.  In *McLeod v. Hartford Life &*

*Accident Co.,* 372 F. 3d 618, 625 (3rd Cir., 2004), the court explained that in pre-existing condition

clauses

1

2          the word "for" "has an implicit intent requirement" and that "it is hard
           to see how a doctor can provide treatment 'for' a condition without
3          knowing what that condition is or that it even exists." [Citation] In
           reaching this conclusion, the Court engaged in a detailed analysis of
4          other courts' renderings of the word "for" in similar contexts, noting
           that although there are differing readings of what constitutes receiving
5          treatment "for" a condition, the word "for" itself must, by definition,
           include a notion of intentionality. See id. ("'for' is 'used as a function
6          word to indicate purpose'" (quoting Webster's Ninth New Collegiate
           Dictionary 481 (1986))).
7

8          Ms. McLeod had received medical care and treatment for symptoms during the

9

10   lookback period, and was later diagnosed with multiple sclerosis.  Hartford denied benefits under the

11   pre-existing condition limitation.  The court held the pre-existing condition limitation, despite being

12   broadly written did not apply because neither Ms. McLeod nor her physicians either knew or

13   suspected her symptoms were connected to the Multiple Sclerosis.

14

15          In this case, Mr. Sorger was seen by a nurse practitioner Nancy Bryant on November

16

17   12, 2012, which was during the lookback period.  The record reflects that he had "No complaints,"

18   and was "'feeling fine.'" AR 1662.  The record notes that he had fatigue in spite of C-Pap but was

19   "doing great with Nuvigil."  He had a history of "depressive illness" for the past 17 years.  "Off and

20   on in cycles." "Depression much improved..."  In the review of systems, under "depression/suicide"

21   it reads "no problem sleeping, has interest in activities, no guilt feelings, has concentration, no

22   appetite changes, no psychomotor agitation or retardation, no suicide ideation."  Under "mood

23   dysregulation" and "anxiety" and "MINI screen," there are similar lists of problems which Mr.

24   Sorger **did not have** at the time of that visit.  The worst that was said of him was that he was

25

26   "somewhat aware of problems and consequences" and that "He has some organization but tends to

27   be tangential." AR 1662.  A review done for defendants by Dr. Warren Taff stated (AR 165 at AR

28

168):

> "The medical documentation provided for review supports that a
> Bipolar diagnosis was considered as a rule out/working diagnosis from
> 10/10/12 to 12/31/12 and the claimant was not actively receiving
> treatment specifically for bipolar disorder.  According to providers, the
> claimant was started on Zyprexa for sleep due to failure of other sleep
> medications, and Lamictal for resistant depression.  The claimant's
> attorney requests a reversal of finding that Bipolar disorder is a pre-
> existing condition.  Although it likely did exist prior to a definitive
> diagnosis being reached, the documentation does not convincingly
> support that the claimant was being treated for Bipolar disorder from
> 10/10/12 through 12/31/12.  Although the claimant was taking
> medications that target Bipolar symptoms, off-label use of these
> medications is supported by the documentation due to resistant
> depression and persistent insomnia."

Nurse Bryant, the treating provider explained that from November 12, 2012 through July 14, 2014, "the Bipolar Diagnosis was uncertain." She notes that her diagnosis of "manic-depressive psychosis" was confused by Metlife with Bipolar 1, "which it is NOT." [emphasis in original.] She further noted that the electronic record diagnosis list available to her did not allow her to input "rule out" or "suspect diagnosis" in the menu choices.  AR 299.  She notes that the Bipolar diagnosis was not concluded until July 24, 2014, well after the lookback period.

Ms. Bryant was treating Mr. Sorger for depression during the lookback period, and not a Bipolar disorder.  Mr. Sorger was seen in December of 2012, during the lookback period, by psychologist Jeffrey Bisaga, who treated him for a "Major Depressive Disorder," and notes that there was no evidence of other conditions at that time.  AR 300.  To the same effect is a note from psychiatrist Dr. J. Gregory Long, who did not begin treating Mr. Sorger until 2015, but reviewed the records from the lookback period.  AR 302.

While Mr. Sorger has a long psychiatric history, the record does not reflect that he

was treated or had symptoms of a Bipolar disorder during October-December, 2012, which is the lookback period.

## VI.
## Conclusion.

Mr. Sorger is entitled to payment of the supplemental benefit. The Court should order the supplemental benefit paid, and direct the parties to meet and confer on the amount of the back benefits due.  If the parties are unable to submit a stipulation to the amount due, a joint letter setting out their differences should suffice for the Court to decide any issue.

In this circuit, ERISA's remedial purposes require that a successful ERISA participant "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Smith v. Cmta-Iam Pension Trust*,  746 F.2d 587,  589 (9th Cir., 1984). Accordingly, Mr. Sorger, should he prevail, intends to file a motion for attorneys' fees under the usual rules.

November 18, 2019

/s/Laurence F. Padway
Laurence F. Padway
Attorney for plaintiff Neil Sorger