United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NEIL MARK SORGER,

      Plaintiff,

      v.

NOVARTIS CORPORATION DEATH
BENEFIT & DISABILITY PLAN, et al.,

      Defendants.

Case No. 19-cv-00105-JSC

**FINDING OF FACTS AND
CONCLUSIONS OF LAW RE:
PARTIES' DISPOSITIVE
MOTIONS**

Re: Dkt. Nos. 40, 42

Neil Mark Sorger sues Novartis Corporation Death Benefit and Disability Plan and Metropolitan Life Insurance Company (together, "Defendants") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, for terminating his supplemental long-term disability benefits. (Dkt. No. 1.)[1] Now before the Court are the parties' dispositive motions.[2] (*See* Dkt. Nos. 40-15, Ex. B (filed under seal) & 42.)[3] After careful consideration of the parties' briefing and the administrative record, and having had the benefit of oral argument on January 16, 2020, the Court concludes that an abuse of discretion standard applies and finds that Defendants did not abuse their discretion in terminating Plaintiff's supplemental disability benefits.

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.
[2] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c). (Dkt. Nos. 6 & 15.)
[3] Defendants characterizes their dispositive motion as a "trial brief," (Dkt. No. 40-15, Ex. B), and Plaintiff has filed a motion for summary judgment, (Dkt. No. 42). At oral argument the Court clarified with the parties that the Court would review the parties' respective motions under the Federal Rule of Civil Procedure 52 "Findings and Conclusions" standard. *See Hoffman v. Screen Actors Guild Producers Pension Plan,* 757 F. App'x 602, 606 (9th Cir. 2019).

# BACKGROUND

## I.    Factual Background

### A.    The Parties

Plaintiff was employed by Novartis Corporation ("Novartis") as a pharmaceutical sales representative starting in December 2012; he became disabled four months later, in April 2013, due to ████████████████████████ (Dkt. No. 1 at ¶ 4; *see also* Dkt. Nos. 40-3, Ex. A-2 at 135 & 40-10, Ex. A-9 at 351 (filed under seal).) Defendant Novartis Corporation Death Benefit and Disability Plan ("the Plan") is a self-funded "welfare benefit plan" governed by ERISA that provides the long-term disability coverage at issue. (Dkt. No. 40-14, Ex. A-13 at 4 (filed under seal).) Defendant Metropolitan Life Insurance Company ("MetLife") is the "Claims Administrator and Plan Administrator" that determines whether a Plan participant is entitled to benefits under the Plan. (*Id.* at 25; *see also* Dkt. No. 40-3, Ex. A-2 at 24 (Summary Plan Description (2012 ed.) listing MetLife as "Claims Administrator and Plan Fiduciary").)[4]

### B.    The Plan

The Plan became effective as of January 1, 2013; it provides self-insured short-term and long-term disability benefits to eligible Novartis employees, as well as death benefits and survivor income benefits. (Dkt. No. 40-14, Ex. A-13 at 4.) Novartis sponsors the Plan. (*Id.*) Under the Plan's terms, Novartis Benefits Committee acts as the Plan Administrator unless it designates another entity "to act as Plan Administrator." (*Id.* at 4, 16; *see also* Dkt. No. 40-3, Ex. A-2 at 24.) The Plan further provides that the Plan Administrator may appoint a "Claims Administrator to handle the administration of claims." (Dkt. No. 40-14, Ex. A-13 at 16.) "Supplement A" to the Plan provides, in pertinent part:

---

[4] The Plan states that it is "amended and restated" and "effective as of January 1, 2013." (*See* Dkt. No. 40-14, Ex. A-13 at 1.) However, the Summary Plan Description submitted by Defendants and cited by both parties is dated "January 2012." (*See* Dkt. No. 40-3, Ex. A-2 at 1.) At oral argument the Court noted that "Supplement A" to the Plan provides that "[t]he eligibility for and terms of the Disability Plan are set forth in this Plan document and in the Summary Plan Description for the Disability Plan, which is hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof." (Dkt. No. 40-14, Ex. A-13 at 25.) The parties agreed that the cited language indicates that the 2012 Summary Plan Description (2012 ed.) is incorporated into the Plan.

1
2
3
4
5

> Short-term and long-term disability benefits under the Disability Plan are administered pursuant to an Administrative Services Only (ASO) agreement between Novartis Corporation and Metropolitan Life Insurance Company (MetLife). The eligibility for and terms of the Disability Plan are set forth in this Plan document and in the Summary Plan Description for the Disability Plan, which is hereby incorporated into the Plan as if fully set forth herein, to the extent not inconsistent with the terms hereof. The Claims Administrator and Plan Administrator for the Disability Plan is MetLife.

6   (*Id.* at 25.)

7   To be eligible for long-term disability benefits under the Plan, a participant must have

8   "received 26 weeks of short-term disability [b]enefits (52 weeks if a resident of the State of

9   California)." (*Id.* at 12.)  There are two levels of long-term disability benefits under the Plan. (*See*

10  *id.*)  First, the Plan provides basic long-term disability benefits to eligible participants at a rate of

11  50% of the employee's total pay. (*Id.*)  The benefit is paid monthly.  Second, a participant may

12  purchase "supplemental long-term disability coverage" ("supplemental benefit") that pays an

13  additional 17%, for a monthly benefit equal to 67% of the participant's total pay. (*Id.*)  The

14  supplemental benefit is "subject to pre-existing condition limitations as established from time to

15  time by the Claims Administrator." (*Id.*)

16  The January 2012 Summary Plan Description includes a "Pre-existing Condition Rule for

17  Supplemental LTD Coverage," that provides, in pertinent part:

18
19
20

> If you have a pre-existing condition and elect supplemental LTD coverage, your supplemental LTD coverage for that pre-existing condition will not take effect for 12 months after the effective date of your supplemental LTD coverage. A pre-existing condition is an injury, sickness, or pregnancy for which you, in the three months before your supplemental LTD coverage took effect:

21
22   - received medical treatment, consultation, care, or services,

23   - took prescription medications or had medications prescribed, or

24   - had symptoms or conditions which would cause a reasonably prudent

25   person to seek diagnosis, care, or treatment.

26
27

> If you should become disabled because of a pre-existing condition, no supplemental LTD benefits are payable under this plan for that disability unless your elimination period (see Qualifying for Long-

28

3

Term Disability)[5] starts after you have been an active employee under this plan for 12 consecutive months.

(Dkt. No. 40-3, Ex. A-2 at 12.)

The Plan provides that "[b]enefits shall be paid from the Sandoz Wanderer Employee Benefits Trust, or any successor thereto."[6] (Dkt. No. 40-14, Ex. A-13 at 14; *see also id.* at 20 ("All costs of the Plan, including Plan benefits and Plan administrative expenses shall be paid by the Employer either through the [VEBA Trust], contracts of insurance (if any), or from the general assets of the Employer.") Novartis currently pays basic long-term disability benefits "from its general funds." (*Id.* at 35.) The VEBA Trust is "used to hold employee contributions for the 17% [supplemental benefit]," and Novartis "reimburses itself from the VEBA [Trust]" to cover the supplemental benefit payments. (*Id.*) Long-term disability benefits under the Plan are only paid for a period of 24 months unless the participant's "[d]isability resulted from schizophrenia, bipolar disorder, dementia or organic brain disease." (*Id.* at 15.)

**C.    Plaintiff's Benefit Payments Under the Plan**

Plaintiff is a Plan participant and currently receives the basic long-term disability benefit at the 50% pre-disability earnings rate for ███████ (Dkt. No. 1 at ¶¶ 2, 6.) He elected coverage for the supplemental benefit effective January 1, 2013. (*See* Dkt. No. 40-3, Ex. A-2 at 135.)

Plaintiff filed a claim for long-term disability benefits under the Plan in September 2013 ████████████████████████████████. (Dkt. No. 40-10, Ex. A-9 at 361, 365-66.) Because Plaintiff purchased supplemental benefit coverage effective January 1, 2013, MetLife conducted a review of the time period between October 1, 2012 through December 31, 2012 ("the look-back

---

[5] A participant's "elimination period occurs when [the participant] receive[s] benefits under the company's short-term disability plan for the maximum 26-week period." (Dkt. No. 40-3, Ex. A-2 at 11.)

[6] It is undisputed that the Sandoz Trust referenced in the Plan is the Sandoz Corporation Voluntary Employees' Beneficiary Association Master Trust ("VEBA Trust"), effective January 1, 1994. (*See* Dkt. No. 40-2, Ex. A-1 at 1 (filed under seal).) Indeed, an internal Novartis document dated September 12, 2018 indicates that "Legacy Sandoz implemented a VEBA (Voluntary Employee Benefit Association) Trust on January 1, 1994 to pay for certain employee benefits on a tax advantaged basis." (*See* Dkt. No. 40-14, Ex. A-13 at 35.) Novartis amended the VEBA Trust effective October 2018 to, among other things, make "[a]ll references to the 'Company' or 'Sandoz Corporation'" mean "Novartis Corporation." (*Id.* at 28.)

4

United States District Court
Northern District of California

1   period") to determine whether ███████████████ were pre-existing conditions. (*Id.*

2   at 366.) On October 10, 2013, MetLife closed Plaintiff's claim because he returned to work

3   October 1, 2013; further, he did not meet the 26-week elimination period. (*Id.* at 368-71.)

4        Plaintiff stopped working in February 2014 and renewed his claim for long-term disability

5   benefits after maxing out his short-term disability benefits. (*Id.* at 377-79.) Plaintiff again sought

6   benefits for disability ██████████████████████████████████" (*Id.* at

7   395-96.) By letter dated April 4, 2014, MetLife approved Plaintiff for the basic benefit effective

8   February 19, 2014 ███████████████ that originally became disabling in April 2013.

9   (*Id.* at 351.) The letter advised Plaintiff that his basic benefit would expire on February 18, 2016,

10  pursuant to the 24-month "maximum benefit duration" for his ██████████████ (*Id.* at

11  352.) The letter also states that MetLife was reviewing Plaintiff's claim to determine whether he

12  was eligible for the supplemental benefit. (*Id.*)

13       A MetLife claim activity report entry dated April 16, 2014 indicates that Plaintiff contacted

14  MetLife and inquired whether "he could receive benefits beyond the 24 [months] for ████

15  ████" (*Id.* at 430.) MetLife responded that it "would need medical documentation to

16  support his inability to work due ██████████████." (*Id.*) MetLife continued to investigate

17  Plaintiff's claim for supplemental benefits and issued a letter to Plaintiff in January 2015

18  approving supplemental benefit coverage ██████████████. (Dkt. No. 40-9, Ex. A-8

19  at 438 (filed under seal).) The letter states, in pertinent part:

20       It was determined that you were not treated for your ████████
         ██████████████ October 1, 2012 through December 31, 2012, and
21       therefore eligible for the supplemental coverage of 67%.

22       Please note that MetLife confirmed that you were treated ████
         ██████████████ November 2, 2012. Based on this
23       information if your disabling condition is no longer due to your
         ██████████████ and/or medical information no longer supports
24       [that it is disabling], and your disability condition is due to ████
         ██████████████ you would not be eligible for the supplemental
25       coverage amount.

26  (*Id.* at 439.) Thus, MetLife approved the supplemental benefit effective February 19, 2014, based

27  on Plaintiff's ██████████████. (*Id.*)

28       In June 2015, MetLife issued a letter to Plaintiff stating, in pertinent part: "In reviewing

United States District Court
Northern District of California

1    your claim, the medical documentation indicates that you are [d]isabled due to ████████

2    ████████         This diagnosis falls under the Plan's limited benefit provision . . ., and has a

3    limitation of 24 months of benefits." (*Id.* at 340.)  The letter also noted that ████████         did

4    not fall under the same 24-month limitation.  (*Id.* at 339.)  MetLife requested, in pertinent part,

5    copies of Plaintiff's most recent ████████     treatment notes.  (*Id.* at 340.)

6          In November 2015, MetLife engaged Dr. ████████, a Board-certified ████████

7    to review the medical record and issue a report regarding Plaintiff's ████████ (*Id.* at 131-

8    39.)  Dr. ████████ report notes a diagnosis from Plaintiff's treating ████████     of

9    ████████ in July 2015, "untreated until [Plaintiff] was in his early 30's." (*Id.* at 135.)  Dr.

10   ████████ also cites a July 2015 treatment note stating that Plaintiff had been on the same

11   ████████ medication "for 2-3 years." (*Id.*)  The report further lists treatment records dated

12   November 2012 through October 2015, some of which indicated symptoms ████████

13   ████████.  (*See id.* at 135-39.)  Dr. ████████ ultimately concluded,

14   however, that there was "inadequate information to support impairment" at any time since January

15   2015.  (*Id.* at 138-39.)

16         MetLife issued a letter to Plaintiff on January 15, 2016, stating, in pertinent part:

17            Based on review of your entire file, our records indicate that you will
              have received 24 months of LTD benefits on February 18, 2016 for
18            ████████, and this is the maximum period payable under the Plan

19            Therefore, your benefits are scheduled to end on February 18, 2016.
              No additional benefits will be payable after February 18, 2016, and
20            your disability claim will have been paid in full in accordance with
              the terms of the Plan.
21

22   (*Id.* at 116-15.)  In July 2016, Plaintiff appealed MetLife's termination of his long-term disability

23   benefits, asserting that he is unable to work because of "████████

24   ████████."  (Dkt. No. 40-5, Ex. A-4 at 105-09 (filed under seal).)  Two

25   months later, MetLife issued Plaintiff a letter stating that it was reversing the termination and

26   reinstating his benefits, effective October 5, 2016, because the information submitted established

27   that he remained disabled under the Plan due to ████████.  (Dkt. No. 40-4, Ex. A-3 at

28   268 (filed under seal); *see also* Dkt. No. 40-5, Ex. A-4 at 13-24 (opinion of Independent Physician

6

1    Consultant Dr. ███████, Board-certified ███████, who reviewed the record and opined

2    that since February 2016, Plaintiff "ha[d] been experiencing severe symptoms of ███████

3    associated with functional impairment" in areas related to employment).)  There is no dispute that

4    MetLife paid the reinstated benefits at the 67% supplemental benefit rate.

5         **D.    Termination of Supplemental Benefit Based on Pre-Existing Condition**

6         In October 2017, MetLife reviewed the claim to determine whether Plaintiff's ███████

7    ███████ was a pre-existing condition.  (Dkt. No. 40-12, Ex. A-11 at 235 (MetLife claim activity

8    report entry noting "[t]here is a note on the claim on 1-13-15 that states claim is not pre-x for

9    ███████ but if ███████ becomes primary it is pre-x") (filed under seal).)  A

10   ███████ Specialist reviewed the claim and determined that Plaintiff received treatment for his

11   ███████ during the look-back period.  The Specialist's opinion was based on a November

12   2012 treatment record from ███████.  (*Id.* at 245-46.)

13   ███████ treatment note under "ASSESSMENT" includes a diagnosis of ███████

14   ███████ and Plaintiff's self-

15   reported history of ███████" (Dkt. No. 40-10, Ex. A-9 at 234-

16   35.)  The Specialist opined that the treatment note indicated that Plaintiff "received treatment for

17   what was then ███████"

18   (Dkt. No. 40-12, Ex. A-11 at 246.)

19        The following month MetLife issued Plaintiff a letter informing him that his ███████

20   ███████ did not meet the criteria for the supplemental benefit because it was a pre-existing

21   condition.  (Dkt. No. 40-4, Ex. A-3 at 204.)  The letter cites the November 2012 treatment record,

22   and states, in pertinent part: "Upon review of your claim file, it has been determined that you

23   received medications and consultations and care during the [p]re-existing look back period of

24   October 1, 2012 through December 31, 2012 ███████"  (*Id.* at 204-05.)  The letter

25   indicates that Plaintiff's supplemental benefit would be terminated effective February 18, 2016

26   and his claim would continue under the basic long-term disability rate of 50% as of February 19,

27   2016.  (*Id.* at 205.)

28        In June 2018, Plaintiff appealed the termination of his supplemental benefit.  (Dkt. No. 40-

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1    3, Ex. A-2 at 290.)  Plaintiff asserted that the ███████████ reflected in the November

2    2012 treatment note was only a working or "'rule out' diagnosis," and submitted statements from

3    his ███████████ providers, including ███████████, who treated him during the look-back period

4    for ███████████████████. (*Id.* at 296-97; *see also id.* at 299 (August 30,

5    2018 statement from ███████████ stating that the preliminary ████ diagnosis on November

6    2012 "was not precise and was only a rule out mode or suspected category," and it was not until

7    July 2014 that the diagnosis of ███████████ was definitive).)  Plaintiff requested reinstatement

8    of the additional 17% supplemental benefit rate.

9        MetLife engaged Independent Physician Consultant Dr. ████████████████

10   ███████, to review Plaintiff's claim file and address whether the medical evidence supports

11   that Plaintiff "received medical treatment, consultation, care or services, and/or had medication

12   prescribed from 10/1/2012 through 12/31/12" for symptoms of ███████████. (*Id.* at 229, 231.)

13   Dr. ████ report clarifies, in pertinent part:

14           [T]he ███████ condition was most likely underlying and did exist prior
             to a definitive diagnosis being reached, however the documentation
15           does not convincingly support that the claimant was being specifically
             treated for the condition of ███████████ from 10/01/12 through
16           12/31/12. My determination is based primarily on the report of ████
             ████████, who is being taken at her word to provide a truthful account
17           of the facts and reports that the claimant was started on ██████████
             ██████████████████████. Of course diagnostic formulation and ongoing
18           treatment planning is a fluid process, and eventually the diagnosis of
             ████████████ was made.   However, without specific clinical
19           evidence of ████████████████████████████████████████ in the specified
20           time period, it is wholly reasonable that the diagnosis of ████ was
             not considered until more clinical evidence presented.  As such and
21           until a definitive diagnosis was made, the prior diagnosis would hold,
             taking precedence over any rule-out or working diagnosis.  The
22           question as I am understanding it appears to be whether the claimant
             received "consultation or care for symptoms for the condition ████
23           ████████████," and not whether the claimant's provider was aware
             of the diagnosis and was specifically treating the *diagnosis* ████████
24           ████████.  If this is indeed the question, then yes indeed the claimant
             received "consultation or care for symptoms or [sic] the condition of
25           ████████████████" although providers' [sic] report that at that time
26           ████████████████ was a rule-out diagnosis.

27   (*Id.* at 231.) Dr. █████ further opined that "[t]he evidence supports that the claimant was being

28

                                              8

1   treated for ████████████ with ██████████████ medications, despite the fact that

2   ████████████ was considered by providers to be a rule-out diagnosis in the [look-back] time

3   period." (*Id.* at 232.)

4          On August 29, 2018, MetLife notified Plaintiff that it had completed its review of "the

5   entire file" and determined that Plaintiff "did not satisfy the requirements of the supplemental

6   coverage"; thus, "denial of the supplemental coverage was appropriate." (Dkt. No. 40-3, Ex. A-2

7   at 135.) The letter cites Dr. ██████ opinion that Plaintiff "received consultation and care for his

8   ██████████ symptoms from October 1, 2012 through December 31, 2012," and includes the

9   pre-existing condition limitation in its entirety. (*Id.* at 136-37.)

10  **II.      Procedural History**

11         Plaintiff filed his complaint seeking review of MetLife's decision pursuant to ERISA, 29

12  U.S.C. 1132, on January 8, 2019. (Dkt. No. 1 at ¶ 1.) Defendants answered the complaint on

13  April 18, 2019, after the parties stipulated to extensions of time. (*See* Dkt. No. 21.) Thereafter,

14  the Court issued a Pretrial Scheduling Order setting a deadline for filing "dispositive motions" in

15  this action and a hearing date for those motions, specifying that the hearing would be a Rule 52

16  bench trial. (Dkt. No. 28 at 1.) The parties subsequently stipulated to several continuances, which

17  the Court granted. (*See* Dkt. Nos. 32, 37, 39.) On November 18, 2019, Defendants filed their

18  dispositive motion and the Administrative Record, (Dkt. No. 40 (filed under seal)), and Plaintiff

19  moved for summary judgment, (Dkt. No. 42). The Court heard oral argument on January 16,

20  2020.

21                                          **DISCUSSION**

22         The issue in this case is whether MetLife's cancellation of Plaintiff's supplemental benefit

23  on the basis that it was "pre-existing" was proper. As an initial matter, however, the parties

24  dispute the standard of review that applies to this Court's review of MetLife's determination.

25  **I.      Standard of Review**

26         A plan participant may sue under ERISA "to recover benefits due to him under the terms

27  of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future

28  benefits under the terms of the plan." 29 U .S.C. § 1132(a)(1)(B). "[A] denial of benefits

United States District Court
Northern District of California

1  challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit

2  plan gives the administrator or fiduciary discretionary authority to determine eligibility for

3  benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Burch*, 489 U.S.

4  101, 115 (1989). "When a plan unambiguously gives the plan administrator discretion to

5  determine eligibility or construe the plan's terms, a deferential abuse of discretion standard is

6  applicable." *Burke v. Pitney Bowes Inc. Long-Term Disability Plan*, 544 F.3d 1016, 1023-24 (9th

7  Cir. 2008). Plaintiff asserts that the Court must review MetLife's determination de novo.

8  Defendants counter that the abuse of discretion standard applies because the Plan includes a

9  discretionary clause. (Dkt. No. 40-15, Ex. B at 16-17.) The Court agrees that the abuse of

10  discretion standard applies.

11  The Plan contains an unambiguous provision giving the Plan Administrator the "express

12  discretionary authorit[y]" to, in pertinent part: (1) "construe and interpret the terms of the Plan,

13  and to resolve all ambiguities, inconsistencies or omissions therein"; (2) "decide all questions of

14  eligibility and determine the amount, manner and time of payment of any benefits." (Dkt. No. 40-

15  14, Ex. A-13 at 16.) Further, the Plan gives the Plan Administrator the power to delegate its

16  authority with regard to its responsibilities under the Plan and "to appoint or name a Claims

17  Administrator to handle the administration of claims." (*Id.*) Based on the Plan's unambiguous

18  grant of discretionary authority to the Plan Administrator to construe the Plan's terms and decide

19  questions of eligibility, and also bestow such authority on the Claims Administrator, the abuse of

20  discretion standard applies.[7] *See Firestone*, 489 U.S. at 115.

21  Plaintiff argues that there are two plans at issue in this case: (1) the "primary plan" or

22  "Plan 1" (i.e., the Plan); and (2) "Plan 2" (the VEBA Trust), which funds the supplemental benefit

23

24  ───────────────

[7] Defendants' motion asserts that "because the Plan is self-insured, ERISA preempts California

25  Insurance Code § 10110.6, and therefore the discretionary clause remains enforceable." (*See* Dkt. No. 40-15, Ex. B at 17-18 (citing *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1136 (9th Cir.

26  2017)).) Plaintiff does not address ERISA preemption of California Insurance Code § 10110.6 in his moving papers. (*See generally* Dkt. Nos. 42 & 44.) Indeed, Plaintiff clarified at oral argument

27  that ERISA preemption of California state law is not at issue in this case, and the Plan's discretionary clause is valid. Thus, the Court need not address the issue of preemption. *See*

28  *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 867 (9th Cir. 2008) ("The parties haven't briefed the preemption question in depth, and we do not consider it.").

provided under the Plan. (Dkt. No. 42 at 11.) Plaintiff asserts that the *de novo* standard applies because the VEBA Trust neither "provides for the exercise of discretion by the ERISA fiduciary, nor reserves the right to delegate discretion." (*Id.*) Plaintiff's argument fails, however, because he presents no evidence that the VEBA Trust is anything other than a funding mechanism for the supplemental benefit provided by the Plan, or that the VEBA Trust is a separate and active ERISA plan of which Plaintiff was ever a participant. Instead, the only ERISA plan that has ever been at issue in this action is the Plan sponsored by Novartis. (*See* Dkt. Nos. 1 at ¶ 2 (alleging that Plaintiff "is a plan participant in the Novartis Corporation Death Benefit & Disability Plan") & 16 (Joint Case Management Conference Statement identifying the Plan as the ERISA plan at issue).) Because it is undisputed that the Plan "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan[,]" the abuse of discretion standard applies. *See Firestone*, 489 U.S. at 115.

"The manner in which a reviewing court applies the abuse of discretion standard, however, depends on whether the administrator has a conflicting interest." *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009). If "the same entity that funds an ERISA benefits plan also evaluates claims," then "the plan administrator faces a structural conflict of interest" because "benefits are paid out of the administrator's own pocket." *Id.* at 630. Plaintiff does not argue that a structural conflict exists and, indeed, a conflict does not exist because Novartis funds the Plan but does not evaluate claims.

The Summary Plan Description identifies MetLife as the "Claims Administrator and Plan Fiduciary" and provides, in pertinent part:

> MetLife is responsible for processing and deciding all claims for benefits under [the Plan], as well as all appeals of denied claims. Benefits are payable under the [Plan] only if MetLife determines, in its discretion, that the claimant is entitled to them.
>
> MetLife is also the [P]lan's fiduciary . . ., which means that MetLife has the authority and discretion to interpret [the Plan], to determine all questions arising under or related to the [Plan], including all questions of fact and questions of eligibility to participate and obtain benefits, and to determine the amount, manner, and time of payment of any benefits under the plans. MetLife's decisions are final and binding.

11

1   (Dkt. No. 40-3, Ex. A-2 at 24.)

2       Thus, Novartis sponsors the Plan and funds the long-term disability benefits from its

3   general funds, funds the supplemental benefit by way of the VEBA Trust, and MetLife is the

4   Claims Administrator and Plan Fiduciary that evaluates claims under the Plan and makes

5   eligibility and payment determinations.  (*See* Dkt. No. 40-3, Ex. A-2 at 24; *see also id.* at 65 (2011

6   "General Services Agreement Task Order" ("2011 Task Order") between Novartis and MetLife

7   providing that "MetLife does not insure and is not liable for Plan Benefits" and "liability is always

8   the obligation of [Novartis]").)  In other words, there is no structural conflict of interest because

9   the entity paying the benefits at issue (Novartis by way of the VEBA Trust) is not the same entity

10   that decides who gets paid (MetLife).  "In the absence of a conflict, judicial review of a plan

11   administrator's benefits determination involves a straightforward application of the abuse of

12   discretion standard."  *Montour*, 588 F.3d at 629.

13       "An ERISA administrator abuses its discretion only if it (1) renders a decision without

14   explanation, (2) construes provisions of the plan in a way that conflicts with the plain language of

15   the plan, or (3) relies on clearly erroneous findings of fact."  *Boyd v. Bert Bell/Pete Rozelle NFL*

16   *Players Retirement Plan*, 410 F.3d 1173, 1178 (9th Cir. 2005).  With this standard in mind, the

17   Court addresses MetLife's determination to terminate Plaintiff's supplemental benefit payment.

18   **II.    MetLife did not Abuse its Discretion**

19       Defendants assert that MetLife's decision to terminate Plaintiff's supplemental benefit was

20   not an abuse of discretion because the evidence demonstrates that his ▮▮▮▮▮▮ was a "pre-

21   existing condition" under the Plan, which precludes entitlement to supplemental long-term

22   disability benefits.  (Dkt. No. 40-15, Ex. B at 21.)  The Court agrees.

23       Under the abuse of discretion standard:

24           [T]he plan administrator's decision can be upheld if it is grounded on
            *any* reasonable basis.  In other words, where there is no risk of bias
25           on the part of an administrator, the existence of a single persuasive
            medical opinion supporting the administrator's decision can be
26           sufficient to affirm, so long as the administrator does not construe the
            language of the plan unreasonably or render its decision without
27           explanation.

28   *Montour*, 588 F.3d at 629-630 (internal quotation marks and citations omitted).  Put another way,

1    to hold that MetLife abused its discretion in terminating Plaintiff's supplemental benefit, the Court

2    "would have to conclude that the entire record leads to a 'definite and firm conviction that a

3    mistake has been committed' by [MetLife]."  *See Boyd*, 410 F.3d at 1179 (quoting *Concrete Pipe*

4    *& Prods. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602, 622

5    (1993)).  The record does not support that conclusion.

**A.   MetLife explained its benefits decision**

7    First, the correspondence from MetLife to Plaintiff indicates that MetLife did not render its

8    decision to terminate Plaintiff's supplemental benefit without explanation.  Instead, MetLife

9    clearly communicated to Plaintiff the bases for its initial determination in November 2017 and its

10   August 2018 decision affirming that determination on appeal.  Further, MetLife's claim activity

11   reports indicate that Plaintiff was in regular contact with MetLife's claims specialists, and

12   MetLife's correspondence to Plaintiff explained how he could contact MetLife to discuss his

13   benefits.

**B.   MetLife reasonably construed the Plan**

15   Second, MetLife reasonably construed the Plan.  *See Montour*, 588 F.3d at 630.  In

16   construing an ERISA plan, courts must "apply contract principles derived from state law . . .

17   guided by policies expressed in ERISA and other federal labor laws."  *Gilliam v. Nevada Power*

18   *Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (internal quotation marks and citation omitted); *see also*

19   *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1439 (9th Cir. 1990) (holding that "the interpretation

20   of ERISA insurance policies is governed by a uniform federal common law").  Thus, the "terms in

21   an ERISA plan should be interpreted in an ordinary and popular sense as would a [person] of

22   average intelligence and experience."  *Gilliam*, 488 F.3d at 1194 (alteration in original) (internal

23   quotation marks and citation omitted).  Further, if a plan's terms are ambiguous, courts may

24   "examine extrinsic evidence to determine the intent of the parties."  *Richardson v. Pension Plan of*

25   *Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997).

26   The Summary Plan Description, expressly incorporated into the Plan, provides, in pertinent

27   part:

28                    Pre-existing Condition Rule for Supplemental LTD Coverage

United States District Court
Northern District of California

> If you have a pre-existing condition and elect supplemental LTD coverage, your supplemental LTD coverage for that pre-existing condition will not take effect for 12 months after the effective date of your supplemental LTD coverage. A pre-existing condition is an injury, sickness, or pregnancy for which you, in the three months before your supplemental LTD coverage took effect:
>
> - received medical treatment, consultation, care, or services,
>
> - took prescription medications or had medications prescribed, or
>
> - had symptoms or conditions which would cause a reasonably prudent person to seek diagnosis, care, or treatment.
>
> If you should become disabled because of a pre-existing condition, no supplemental LTD benefits are payable under this plan for that disability unless your elimination period (see Qualifying for Long-Term Disability) starts after you have been an active employee under this plan for 12 consecutive months.

(Dkt. No. 40-3, Ex. A-2 at 12.) Under the final paragraph, if a participant becomes disabled because of a pre-existing condition, he will never receive supplemental disability benefits for that disability unless he has been an active employee under the plan for 12 consecutive months. If he has been an active employee for 12 consecutive months preceding his elimination period (short-term disability benefits), then under the first paragraph he can receive supplemental disability benefits for a disabling pre-existing condition, with such benefits beginning 12 months after the effective date of the supplemental benefit coverage. By terminating Plaintiff's supplemental benefits because of a pre-existing condition, MetLife therefore implicitly found that Plaintiff had not been an active employee under the plan for 12 consecutive months before the commencement of his elimination period.

At the January 16, 2020 hearing, Plaintiff argued for the first time that the phrase "active employee under this plan for 12 consecutive months" is at issue, and that MetLife abused its discretion by not considering Plaintiff an "active employee" under the Plan given that he had been a Novartis employee "under" the Plan since it became effective in January 2013. Plaintiff appears to argue that in calculating the 12 consecutive months as an active employee, Defendants should have counted the time Plaintiff was receiving disability benefits under the Plan. Plaintiff's belated argument fails because MetLife did not abuse its discretion in not considering time that Plaintiff

1  was not working and instead receiving disability benefits as time spent as "an active employee

2  under the plan."

3      First, Plaintiff's June 2018 letter of appeal—drafted by his then-counsel—recognizes that

4  Plaintiff "did not work for Novartis for 12 consecutive months before he had to leave work due to

5  disability." (See Dkt. No. 40-3, Ex. A-2 at 291.)  The administrative record supports that

6  statement and demonstrates that Plaintiff actively worked for Novartis from December 20, 2012

7  through April 9, 2013, (see Dkt. No. 40-3, Ex. A-2 at 135), and again from October 1, 2013

8  through February 11, 2014, (see Dkt. No. No. 40-10, Ex. A-9 at 464).

9      Second, Plaintiff's June 2018 letter of appeal—drafted by his then-counsel—interprets the

10  pre-existing condition limitation in the same manner as Defendants.  Plaintiff's letter states, in

11  pertinent part:

12      According to Novartis policy, if an individual has received medical
       treatment, consultation, care or services during the 3-month period;
13      or if he took medications or was prescribed them during that period;
       or if he had symptoms that would have caused a reasonably prudent
14      person to get care, then the pre-existing condition exists and a
       claimant cannot receive benefits at the 67% level *unless he was able*
15      *to   work   for   12 continuous months before the disability*
       *commences*.
16
       Because the issue on appeal concerns only the 3-month period from
17      October 1, 2012 to December 2012, the documentation in support of
       [Plaintiff's] claim  is  concise and directed solely at the issue –
18      whether his ▮▮▮▮▮ was a pre-existing condition under the Novartis
       plan.
19

20  (Dkt. No. 40-3, Ex. A-2 at 296 (emphasis added).)  In other words, until oral argument on January

21  16, 2020, Plaintiff had communicated that he understood that the "active employee under this

22  plan" language in the limitation meant "*actively working*."

23      Third, Defendants' interpretation (consistent with Plaintiff's earlier interpretation) is the

24  only interpretation that makes sense and, in any event, is not an abuse of discretion.  The pre-

25  existing condition limitation does not state "participant under this plan" or even simply an

26  "employee under this plan"; instead, it specifies "*active* employee under this plan."  The only

27  reasonable interpretation for qualifying "employee" with "active" is that Novartis intended to

28  require a participant under the Plan to actively work for at least 12 consecutive months before

15

being able to receive the supplemental benefit for a condition that pre-existed the participant's enrollment in the supplemental benefits plan but later became disabling.

### C. MetLife did not rely on clearly erroneous findings of fact

Finally, MetLife did not "rel[y] on clearly erroneous findings of fact," and instead based its decision on a persuasive medical opinion. *See Boyd*, 410 F.3d at 1178-79. A ███████████ Specialist first reviewed the claim and determined that during the look-back period, and specifically, on November 12, 2012, Plaintiff "received treatment for what was then ██████████ ██████████████████████████████," and "also received medications used in the treatment of ███████████." (*See* Dkt. No. 40-12, Ex. A-11 at 245-47 (citing the treatment record of ███████████ and opining "that the ███████████████████ ███████████████████████████████████████████ ," and that ███████ is "common treatment for ██████ ," as well as ██████ which is used in treatment for ████████ ██████").) That determination is reasonably supported by ███████████ treatment note, which includes a diagnosis of "████████████████████████████" and an active medication regimen. (Dkt. No. 40-10, Ex. A-9 at 234-35.) The treatment note also reports Plaintiff's subjective "████████████," stating, in pertinent part: "████████████ ██████. Off and on, in cycles. ████████ much improved since he is not crushing his ████." (*Id.* at 234.)

Dr. ████ July 2018 independent medical opinion then confirmed that Plaintiff received "consultation or care for symptoms or [sic] the condition of ████████" and "was being treated for ████████ with ████████████ medications, despite the fact that ████████ was considered by providers to be a rule-out diagnosis in the [look-back] time period." (Dkt. No. 40-3, Ex. A-2 at 231-32.) Dr. ████ rendered his opinion after reviewing Plaintiff's ████████ treatment records from August 2012 through June 2018. (*See id.* at 227-29.) Because Dr. ████ is a ████████ and his opinion reflected a thorough review of the relevant medical evidence, MetLife did not abuse its discretion in finding his opinion persuasive. *See Boyd*, 410 F.3d at 1179 (noting that "even a single persuasive medical opinion may constitute

16

1    substantial evidence upon which a plan administrator may rely in adjudicating a claim").

2         Plaintiff argues that "the record does not reflect that he was treated [for] or had symptoms

3    of ███████████ during [the look-back period]." (Dkt. No. 42 at 6 (citing Plaintiff's ███

4    ███ treatment records).)  This argument fails for the reasons previously stated.  MetLife based

5    its final determination to affirm the termination of Plaintiff's supplemental benefit on the opinion

6    of Dr. ███, who reviewed the medical evidence and opined that Plaintiff "received consultation or

7    care for symptoms" of ███████████ during the look-back period and "[t]he evidence supports

8    that the claimant was being treated for ██████ symptoms with ████ and ██████

9    medications, despite the fact that █████████████ was considered by providers to be a rule-out

10   diagnosis" during the look-back period.  (See Dkt. No. 40-3, Ex. A-2 at 231-32.)  MetLife did not

11   abuse its discretion in relying on Dr. ███ opinion, which expressly considered the records cited

12   by Plaintiff.  See Boyd, 410 F.3d at 1179 ("We hold that a mere tally of [medical] experts is

13   insufficient to demonstrate that an ERISA fiduciary has abused its discretion, for even a single

14   persuasive medical opinion may constitute substantial evidence upon which a plan administrator

15   may rely in adjudicating a claim."); see also Kaiser v. Standard Ins. Co., 314 F. App'x 921, 922-

16   23 (9th Cir. 2008) (finding no abuse of discretion in plan administrator's "decision to rely upon its

17   consultants rather than upon the opinions of [the plaintiff's] physicians, or, ultimately, in its

18   consideration of the consulting physicians' opinions during its handling of the review process").

19        Plaintiff's citation to McLeod v. Hartford Life & Accident Co., 372 F.3d 618 (3rd Cir.

20   2004) fails to persuade otherwise and is distinguishable on its facts.  First, McLeod involved a

21   "heightened arbitrary and capricious standard [of review]" based on a structural conflict of interest

22   that is not present here.  See 372 F.3d at 623-24.  That standard of review factored heavily in the

23   court's determination; specifically:

24        [The defendant] would have us hold that receiving medical care "for
          symptoms" of a pre-existing condition encompasses receiving care
25        for symptoms that no one even suspected were connected with the
          later diagnosed ailment  but which were later deemed not
26        inconsistent with it, but a heightened standard of review will not
          countenance such a strained interpretation. In a case of heightened
27        review, where the plan administrator is not afforded complete,
          freewheeling discretion, we  must  be especially mindful to ensure
28        that the administrator's interpretation of policy language does not

                                    17

unfairly disadvantage the policy holder. ERISA was enacted "'to promote the interests of employees and their beneficiaries in employee benefit plans' and to 'protect contractually defined benefits.'" *Were the Plan's language the subject of non-heightened discretionary review, and had [the defendant] provided a plausible reason for its interpretation, then perhaps the result would be different.*

*Id.* at 624 (emphasis added) (internal citations omitted).

Here, in contrast, the Plan's language is subject to "non-heightened discretionary review" and Defendants have "provided a plausible reason for [their] interpretation." *See id.* Second, *McLeod* did not involve a working or rule-out diagnosis of the condition at issue during the look-back period. Instead, in *McLeod*, "no one even suspected" during the look-back period that the symptoms of the later-diagnosed condition were connected to that condition. *See id.* That is not the case here; indeed, ████████ March 2018 statement in support of Plaintiff's administrative appeal states that "[d]uring the dates of November 12, 2012 through July 14, 2014, ████████ Diagnosis was uncertain," and "should not have been considered as a conclusive diagnosis but a working diagnosis." (*See* Dkt. No. 40-3, Ex. A-2 at 299 (stating that "[t]he preliminary diagnosis was not precise and was only in a rule out mode or suspected category for the November 12, 2012 medical visit").) Thus, *McLeod* does not help Plaintiff.

\*\*\*

In sum, Defendants did not abuse their discretion in determining that Plaintiff's ████ condition was a pre-existing condition under the terms of the Plan and terminating Plaintiff's supplemental benefit accordingly.

### D.   Plaintiff's other arguments

Plaintiff asserts that Defendants nonetheless wrongfully terminated his supplemental benefit because: (1) the pre-existing condition limitation "was never properly authorized"; (2) "it ceased to apply as of January 1, 2014"; and (3) the Plan does not contain a provision authorizing MetLife to grant supplemental benefits and "retroactively change its decision." (Dkt. No. 42 at 6.)

#### 1.   MetLife was authorized to enforce the pre-existing condition limitation

The Plan's description of the supplemental benefit provides, in pertinent part: "Such supplemental long-term disability coverage shall be subject to pre-existing condition limitations as

18

established from time to time by the Claims Administrator." (Dkt. No. 40-14, Ex. A-13 at 12.) Plaintiff asserts that the pre-existing condition rule set forth in the Summary Plan Description is "unauthorized" because the Summary Plan Description, which is the only Plan document that contains the pre-existing condition limitation, was prepared by Novartis instead of Claims Administrator MetLife, and MetLife "was never asked to, and did not, author any rules for pre-existing conditions." (Dkt. No. 42 a 7-8.) Plaintiff's argument fails to persuade.

First, it makes no sense to interpret the Plan's supplemental benefit provision as granting sole authority to the Claims Administrator to *create* such pre-existing condition limitations because doing so would mean that the Plan's sponsor—Novartis—is precluded from creating such rules or that MetLife is precluded from enforcing the pre-existing condition rule that Novartis *had already created*. Indeed, the Summary Plan Description containing the pre-existing condition rule at issue was authored *before* the Plan became effective on January 1, 2013 and was expressly incorporated into the Plan. (*See* Dkt. No. 40-14, Ex. A-13 at 25.) The Plan provides, in pertinent part, that "eligibility for and terms of the [ ] Plan" described in the Summary Plan Description are fully incorporated into the Plan "as if fully set forth" in the Plan itself. (*Id.*) It follows that any rules Novartis set forth in the Summary Plan Description are conclusive and binding on Plan participants, as long as such rules are not inconsistent with the Plan's terms. Plaintiff cannot reasonably argue that the pre-existing condition rule is inconsistent with the Plan's terms when the Plan expressly provides that pre-existing condition limitations may apply to the supplemental benefit. Thus, the more reasonable interpretation of the provision is that the Claims Administrator has the authority to apply the pre-existing condition limitation in making determinations regarding the supplemental benefit, not that the Claims Administrator is authorized to enforce such a limitation only if the Claims Administrator—and not the author of the Plan and Summary Plan Description—creates it.

Further, that Novartis and not MetLife authored the Summary Plan Description is of no moment because the Task Order setting forth MetLife's duties as Claims Administrator and Plan Fiduciary expressly incorporates the Summary Plan Description. "Appendix B: Summary Plan Description" of the Task Order provides, in pertinent part:

United States District Court
Northern District of California

> [T]he portions of the Summary Plan Description pertaining to disability income benefits administered by MetLife under and subject to the terms and conditions of this Task Order are incorporated by reference in their entirety as Appendix B: Summary Plan Description.

(Dkt. No. 40-3, Ex. A-2 at 74.) The Task Order also provides, that:

> each time [a Summary Plan Description] is itself modified, Appendix B: Summary Plan Description will be deemed to have been amended to incorporate such modified [Summary Plan Description] as of the time MetLife has been given notice of the changes reflected in such modified [Summary Plan Description].

(*Id.* at 65.) In other words, each time Novartis issues a Summary Plan Description, the portions concerning "disability income benefits" are incorporated in their entirety in the Task Order governing MetLife's duties as Claims Administrator. Thus, MetLife was not only authorized to enforce the pre-existing condition limitation in terminating Plaintiff's supplemental benefit, it was *required* to consider its application because the rule was incorporated by reference in the Task Order.

Simply put, the pre-existing condition limitation cited in MetLife's decision was "authorized" because it was created by the Plan's sponsor, set forth in the Summary Plan Description, and incorporated into the Plan itself. As Claims Administrator, MetLife is charged with interpreting and enforcing the terms of the Plan, and that is precisely what MetLife did.

Plaintiff's citation in his reply to *CIGNA Corp. v. Amara*, 563 U.S. 421 (2011) does not counsel a different result. The *Amara* Court held that "summary documents, important as they are, provide communication with beneficiaries *about* the plan, but that their statements do not themselves constitute the terms of the plan for purposes of [an ERISA claim]." 563 U.S. at 438. The Ninth Circuit has interpreted *Amara* as standing for "either of two fairly simple propositions": "(1) the terms of the [Summary Plan Description] are not enforceable when they conflict with governing plan documents, or (2) the [Summary Plan Description] cannot create terms that are not also authorized by, or reflected in, governing plan documents." *Mull for Mull v. Motion Picture Indus. Health Plan*, 865 F.3d 1207, 1210 (9th Cir. 2017) (quoting with approval *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1131 (10th Cir. 2011)). Neither situation applies here. First, the terms of the Summary Plan Description do not conflict with the Plan; the

20

1   Plan references pre-existing condition limitations and the Summary Plan Description sets forth the

2   limitations in detail.  Second, and similarly, the Summary Plan Description does not create new

3   terms but instead sets forth a rule reflected in the Plan; indeed, the Summary Plan Description "is

4   part of the [P]lan itself."  *See Mull for Mull*, 865 F.3d at 1210 ("*Amara* does not prohibit this type

5   of arrangement.").

6        Plaintiff's argument that the Plan's reference to "pre-existing condition limitations as

7   established from time to time by the Claims Administrator" constitutes an impermissible

8   delegation of authority under ERISA similarly fails.  Plaintiff asserts:

9           [T]he plan sponsor may not delegate to someone else the right to
10          determine, and alter, the terms of the plan, especially without
            reserving the final right to approve of those terms.  To the extent,
11          therefore, that the plan purported to make MetLife responsible for the
            terms of its pre-existing condition language, that is an improper
12          delegation, and the pre-existing condition language, had MetLife
            provided any would not be a valid part of [the Plan].

13  (Dkt. No. 42 at 10.)  Plaintiff posits that his argument presents an "interesting question" that

14  "appears to be one of first impression," and asks whether such delegation "make[s] the plan, to

15  that extent, illusory?"  (*Id.* at 9.)

16       The Court need not address that question, however, because Plaintiff is wrong to the extent

17  he argues that the Plan's reference to "pre-existing condition limitations" constitutes an

18  impermissible delegation of authority to *alter the terms* of the Plan.  The Plan itself gives the Plan

19  Administrator "authority to control and manage the operation and administration of the Plan,"

20  including the "express discretionary authorit[y]" to, in pertinent part "delegate authority with

21  regard to its responsibilities" to a Claims Administrator.  (Dkt. No. 40-14, Ex. A-13 at 16.)  Those

22  responsibilities include "adopt[ing] such rules, regulations and bylaws as it deems necessary or

23  desirable."  (*Id.* at 17.)  Further, the Plan provides that "[a]ll determinations, interpretations, rules,

24  and decisions of the Plan Administrator or its delegate shall be conclusive and binding upon all

25  persons having or claiming to have any interest or right under the Plan."  (*Id.* at 18.)  Thus, the

26  Plan's reference to "pre-existing condition limitations as established from time to time by the

27  Claims Administrator" is consistent with the authority granted in the Plan Administrator to

28  delegate its discretionary authority to determine rules of eligibility.  More importantly, Plaintiff's

United States District Court
Northern District of California

21

United States District Court
Northern District of California

1   argument raises a non-issue because Novartis as Plan Sponsor created the precise rule at issue—

2   the pre-existing condition limitation—and that rule does not conflict with the terms of the Plan for

3   the reasons previously stated.

4            **2.**       **The pre-existing condition limitation did not expire on January 1, 2014**

5          Plaintiff next asserts that the pre-existing condition limitation "does not apply to any

6   disability after January 1, 2014" because he elected the supplemental benefit effective January 1,

7   2013, and the limitation provides:

8                   If you have a pre-existing condition and elect supplemental LTD

9                   coverage, *the supplemental LTD coverage for that pre-existing condition will not take effect for 12 months after the effective date of your supplemental LTD coverage.*

10

11   (Dkt. No. 42 at 13 (emphasis added).)  Plaintiff interprets that provision as meaning that the

12   limitation does not "apply more than one year after the effective date of the coverage."  (Dkt. No.

13   44 at 5.)  Thus, Plaintiff asserts that "the pre-existing limitation ended well before [he] was

14   disabled by ▮▮▮▮▮▮▮▮' and began receiving benefits for that condition in February 2016.

15   (*Id.* at 5.)

16          Defendants counter that Plaintiff misinterprets the provision, and that it "simply provides

17   that, if you have a pre-existing condition, and you elect coverage for supplemental LTD benefits,

18   then you would not actually be covered for those benefits for that pre-existing condition until 12

19   months after the effective date of coverage."  (Dkt. No. 43-2, Ex. A at 15-16.)  In other words, the

20   language "relates to the date of coverage, and not to the eligibility for benefits themselves."  (*Id.* at

21   16.)  The Court agrees.  The plain language of the provision supports Defendants' reading that it

22   applies to the *effective date* of supplemental benefit coverage for a pre-existing condition and does

23   not concern whether a pre-existing condition falls within the scope of the limitation and bars the

24   supplemental benefit.  Indeed, that is the only reasonable interpretation.

25            **3.**       **MetLife did not abuse its discretion in revisiting supplemental benefit award**

26

27          Plaintiff also argues that MetLife's determination was improper because "[t]here is no

28   provision of the plan which permits it to simply change its mind about an award of benefits."

United States District Court
Northern District of California

1  (Dkt. No. 42 at 14.)  Plaintiff is wrong.  The Summary Plan Description provides that as Claims

2  Administrator, "MetLife is responsible for processing and deciding all claims for benefits under

3  [the Plan], as well as all appeals of denied claims.  Benefits are payable under the [Plan] only if

4  MetLife determines, in its discretion, that the claimant is entitled to them." (Dkt. No. 40-3, Ex. A-

5  2 at 24.)  Further, as Plan Fiduciary, "MetLife has "discretion to interpret [the Plan], to determine

6  all questions arising under or related to the [Plan], including all questions of fact and questions of

7  eligibility to participate and obtain benefits, and to determine the amount, manner, and time of

8  payment of any benefits under the plans." (*Id.*)

9      MetLife told Plaintiff in 2015 that he would not be eligible for supplemental coverage for a

10  disabling ████████ condition because of the pre-existing condition limitation for supplemental

11  benefits:

12      It was determined that you were not treated for your ████████
        condition from October 1, 2012 through December 31, 2012, and
13      therefore eligible for the supplemental coverage of 67%.

14      ***Please note that MetLife confirmed that you were treated for***
        ***████████ with Dr. ████ on November 2, 2012.  Based on this***
15      ***information if your disabling condition is no longer due to your***
        ***████████ condition and/or medical information no longer***
16      ***supports [that it is disabling], and your disability condition is due to***
        ***a ████████ condition you would not be eligible for the***
17      ***supplemental coverage amount.***

18  (Dkt. No. 40-9, Ex. A-8 at 439 (emphasis added).)  Despite that 2015 determination, when

19  MetLife reinstated Plaintiff's long-term disability benefits in 2016 in light of the evidence of his

20  ████████ disability it reinstated the supplemental benefits as well.  The following year, however,

21  MetLife revisited its decision to pay Plaintiff at the supplemental benefit rate for his ████████

22  ████████, consistent with its 2015 determination that Plaintiff's ████████ condition was pre-

23  existing.  Plaintiff does not cite any caselaw or anything in the Plan which suggests that MetLife

24  did not have the authority to do so.

25      Because MetLife had the authority and discretion to revisit its previous decision to award

26  the supplemental benefit and did not abuse its discretion in doing so, the Court declines to address

27  Plaintiff's single reference to the "doctrine of unilateral mistake."  The Court also notes that

28  MetLife did not seek reimbursement for the supplemental benefits previously paid; instead, it

23

1    stopped future payments of such benefits.

2        **E.   Other issues**

3        Plaintiff's motion includes a section that contains several statements of law, specifically

4    that: (1) "exclusions and limitations of coverage must be 'clear, plain, and conspicuous'; (2) "the

5    burden of proof on limitations and exclusions from coverage lies with the plan"; (3) [a]mbiguities

6    created by the plan drafters are construed against the plan, as the rule of *contra preferentem* [sic]

7    applies in all 50 states"; and (4) the Summary Plan Description must give Plan participants notice

8    of their rights and duties under the Plan in accordance with 29 U.S.C. § 1022(a).  (Dkt. No. 42 at

9    12.)  However, Plaintiff provides no argument in connection with these statements of law, and the

10   Court addresses them accordingly.

11       First, the pre-existing limitation in the Summary Plan Description is "clear, plain, and

12   conspicuous enough to negate layman [Plaintiff's] objectively reasonable expectations of

13   coverage." *See Scharff v. Raytheon Co. Short Term Disability Plan*, 581 F.3d 899, 905 (9th Cir.

14   2009) (noting that the "reasonable expectations doctrine" applies to ERISA insurance plans).  Pre-

15   existing limitations are referenced in the Plan and the limitation is set forth in clear, plain language

16   in the Summary Plan Description.  Further, the limitation is easily identifiable within the body of

17   the Summary Plan Description by a headline that is a different color and larger size than the text

18   below it.  (*See* Dkt. No. 40-3, Ex. A-2 at 12 ("Pre-existing Condition Rule for Supplemental LTD

19   Coverage").)  For the same reasons, the relevant section of the Summary Plan Description is

20   "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries

21   of their rights and obligations under the plan." *See* 29 U.S.C. § 1022(a).

22       Second, Defendants have satisfied their burden of demonstrating that the pre-existing

23   condition limitation applies because MetLife did not abuse its discretion by applying the limitation

24   for the reasons previously stated.  Finally, the doctrine of *contra proferentem* does not apply in

25   interpreting ambiguous terms in an ERISA-covered plan where, like here, the plan "grants the

26   administrator discretion to construe its terms." *Blankenship v. Liberty Life Assurance Co. of*

27   *Boston*, 486 F.3d 620, 625 (9th Cir. 2007).  The only question for the reviewing court in such

28   cases is whether the administrator's interpretation is reasonable. *Day v. AT&T Disability Income*

United States District Court
Northern District of California

1    *Plan*, 698 F.3d 1091, 1098 (9th Cir. 2012).  As previously discussed, MetLife's interpretation of

2    the pre-existing condition limitation as it applied to Plaintiff's ███████████ was reasonable.

3    //

4    **III.    Defendants' Administrative Motions to File Under Seal**

5           A party must demonstrate "compelling reasons" to seal judicial records attached to a

6    dispositive motion.  *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006).

7    Further, parties moving to seal documents must comply with the procedures set forth in Civil

8    Local Rule 79-5.  The rule permits sealing only where the parties have "establish[d] that the

9    document or portions thereof is privileged or protectable as a trade secret or otherwise entitled to

10   protection under the law."  Civ. L.R. 79-5(b).

11          Defendants move to file under seal the entire administrative record, consisting of 4,829

12   pages, and the unredacted versions of their trial brief and opposition to Plaintiff's motion for

13   summary judgment.  (*See* Dkt. Nos. 40 & 43.)  Defendants assert that the material warrants sealing

14   "because it contains extensive confidential and private information about Plaintiff, including

15   personal identifiers such as his social security number, date of birth, and home address," as well as

16   medical records containing "Plaintiff's private health information, which is protected by the

17   Health Insurance Portability and Accountability Act (HIPAA)."  (Dkt. No. 40.)

18          The Court agrees that sealing the material is warranted because it includes Plaintiff's

19   personal medical information and multiple references to personal identifying information;

20   Plaintiff's privacy interests in such information outweigh the public's general right to access court

21   documents.  *See, e.g., Sullivan v. Prudential Ins. Co. of Am.*, No. 2:12-cv-01173-GEB-DAD, 2012

22   WL 3763904 (E.D. Cal. Aug. 29, 2012) (granting parties' joint motion to lodge administrative

23   record in ERISA action under seal because it "contain[ed] references to sensitive information");

24   *San Ramon Reg'l Med. Ctr., Inc. v. Principal Life Ins. Co.*, No. C 10-02258 SBA, 2011 WL

25   89931, at *1 n.1 (N.D. Cal. Jan. 10, 2011) (sua sponte sealing confidential medical information

26   deemed confidential under HIPAA).  Further, because the record spans thousands of pages and is

27   replete with Plaintiff's personal medical and identifying information, redaction is impracticable.

28          Accordingly, the Court grants Defendants' administrative motions to seal in their entirety.

United States District Court
Northern District of California

This Order shall be provisionally filed under seal and the parties shall meet and confer to redact the portions of the Order that quote any sealed material.  The parties shall provide the Court with their proposed redactions within 14 days of this Order.

## CONCLUSION

For the reasons stated above, and pursuant to Federal Rule of Civil Procedure 52, the Court concludes that an abuse of discretion standard of review applies.  The Court further finds that Defendants did not abuse their discretion in determining that Plaintiff's ███████ was pre-existing and terminating his supplemental benefit pursuant to the Plan's pre-existing condition limitation.

This Order disposes of Docket Nos. 40, 42, and 43.

**IT IS SO ORDERED.**

Dated: January 22, 2020

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California